| | | | | |
|---|---|---|---|---|
| **Name of Assigned Judge or Magistrate Judge** | REBECCA R. PALLMEYER | **Sitting Judge if Other than Assigned Judge** | | |
| **CASE NUMBER** | 03 C 1839 | **DATE** | August 12, 2003 | |
| **CASE TITLE** | Stanfield Steele (IDOC #N-50702) v. B. Kane, et al. | | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

# United States District Court, Northern District of Illinois

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff may proceed with his claim that the "John Doe" Defendants failed to protect him from assault. All other Defendants are dismissed, except Briley, who is retained as nominal Defendant, dismissing Defendants Kane, Johnson, Knight, Page, Welsh, Durrett, Schomig, Reider, Pierson, Robinson, Dallas, Lazar, Harry and Snyder. The clerk shall issue summons for Defendant Briley, and the U.S. Marshal shall serve him with summons and copies of the complaint and this order. Briley is not required to answer the complaint, but within thirty days of service Briley (or his attorney or agent) shall name and provide identification photographs of the officers involved in the incident of August 19, 2001, and certify to the court that this has been done. Within thirty days thereafter Plaintiff shall file an amended complaint naming these officers as Defendants.

(11) ■ For further detail see order attached to the original minute order.

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | number of notices |
| Notices mailed by judge's staff. | |
| Notified counsel by telephone. | AUG 1 3 2003 date docketed |
| ✓ Docketing to mail notices. | |
| Mail AO 450 form. | AR docketing deputy initials |
| Copy to judge/magistrate judge. | |
| courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office — mailing deputy initials |

Document Number: 9

03 AUG 12 PM 1:11
U.S. DISTRICT COURT
FILED FOR DOCKETING
ED-1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANFIELD STEELE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 03 C 1839 |
| v. ) | |
| ) | Judge Rebecca R. Pallmeyer |
| B. KANE, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Stanfield Steele, a prisoner in the custody of the Illinois Department of Corrections (IDOC) at Menard Correctional Center, filed this pro se civil rights action under 42 U.S.C. § 1983 against IDOC officials at Hill, Stateville and Pontiac Correctional Centers. The court permitted Steele to proceed without prepaying the filing fee; and the initial partial payment required by 28 U.S.C. § 1915(b) has been received. The court proceeds to review the complaint as directed by 28 U.S.C. § 1915A to identify cognizable claims and dismiss any portion of the complaint it finds is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant immune from such relief. In making this assessment, the court accepts the allegations of the complaint as true and draws all reasonable inferences in Steele's favor. *Wynn v. Southward*, 251 F.3d 588, 591-92 (7th Cir. 2001).

Steele's complaint arises from three incidents: two disciplinary actions based on the statements of confidential informants and the failure of certain Defendants to protect him from assault by another inmate. Only the last states a claim upon which relief may be granted.

I.    **Segregation and Transfer in April-May 2000**

The following account is taken from Steele's complaint and attached exhibits. On April 26, 2000, while Steele was confined at Hill Correctional Center at Galesburg, Illinois, he was placed in the segregation unit although he had not been charged with a rule violation. The next day Steele

was transferred from Hill, a medium-security facility, to the disciplinary segregation unit at maximum-security Stateville Correctional Center, where he was kept in segregation until June 1, 2000. That evening, Steele was served with a disciplinary report dated June 1, 2000, prepared by Defendant Captain B. Kane, whom Steele identifies as "Internal Affairs Operations Officer" at Hill Correctional Center. Complaint Attachment A-1.

Kane's disciplinary report identified May 24, 2000 as the "observation date," the date of the charged offense, but recited information obtained from confidential informants at an earlier date. The disciplinary report stated that Steele was second in command of the "Maniac Latin Disciples" gang at Hill, part of the "Latin Folks" alliance.[1] According to the report, Steele and the gang leader, an inmate named Williams, had ordered two inmates to leave Hill immediately, because they were suspected of being traitors to the Latin Folks. (How the gang leadership expected to control IDOC's transfer decisions is not explained.) According to the report, because the two inmates had not left Hill, a meeting of the Latin Folks had been planned for April 29, 2000, where the gang leaders would "dictate the punitive measures to be taken" against the suspected "traitors." The meeting was thwarted when Steele and Williams were placed in investigative confinement on April 26.

Steele complains that his purportedly investigative confinement (also referred to as administrative segregation) violated IDOC rules, which require the approval of the institution's chief executive officer (i.e., the warden) for investigative confinement lasting more than three days. Steele alleges in the complaint that before being transferred to Stateville he wrote both Kane and Defendant Mark Pierson, at that time the warden at Hill, and received no response.[2]

---

[1] IDOC now uses the term "Security Threat Group," or "STG," rather than "gang," but the four-letter term suffices here.

[2] This statement is inconsistent with Steele's grievance dated June 19, 2000, concerning the incident, Cmplt. Attachment A-3, where he states that he was taken to segregation (continued...)

2

At Stateville, Steele appeared at a disciplinary hearing on June 7, 2000, before the Stateville Adjustment Committee chaired by Defendant A. Johnson. Steele points out that under IDOC rules, Adjustment Committee hearings are to be held within 14 days of the observation or discovery of the alleged offense. Although the disciplinary report was dated May 24, 2000, the observations had obviously been made prior to April 26. At the hearing, Steele presented a written statement denying the charges and asking that certain witnesses be contacted, a request he alleges Johnson refused.

Steele never received a summary of the findings of the Adjustment Committee, and perhaps the Committee never prepared such a summary. Although he had been released from segregation, Steele, apparently believing the charges were still pending, filed an emergency grievance on June 19, 2000, Cmplt. Attachment A-3, asking for a polygraph examination to prove his innocence. The grievance was rejected as a non-emergency matter by Defendant James Page, the warden of Stateville at the time. Cmplt. Attachment A-4.

After Steele was subsequently denied a transfer to medium-security Danville Correctional Center in November of 2000, Cmplt. Attachment B, he filed a new grievance on December 6, 2000, Cmplt. Attachment C, demanding to know the disposition of the charges against him. Defendant Correctional Counselor Dawn Knight responded on January 5, 2001, Cmplt. Attachments A-2, C, that not only was there no Adjustment Committee summary in Steele's master file, but the corresponding disciplinary report, a copy of which Steele had received, was also missing.

Steele pursued his grievance to the next level, and on March 2, 2001, Defendant Kenneth Briley, who had succeeded Page as warden of Stateville, approved Defendant Grievance Officer Judy Welsh's recommendation that Johnson, the Adjustment Committee chairperson, be asked

---

(...continued)
at 9:45 p.m. on April 26, 2000, and was sent to Stateville at 8:00 a.m. the next day. Having been confined in segregation less than twelve hours, he could hardly have complained to Warden Pierson about the length of his confinement at that time.

to "determine whether or not a hearing occurred and supply Grievance Office with a copy of the summary if possible." Cmplt. Attachment E. Steele never received a summary, and has demanded to know by what authority he was kept in segregation for 35 days. Cmplt. Attachment F.

That demand will not be answered here. The disappearance of the disciplinary report from Stateville's files and the absence of Adjustment Committee documentation may raise questions about the integrity of the disciplinary process at Stateville, but they raise no issues under the Constitution, even if Steele's 35 days in segregated confinement violated IDOC regulations. A state official's violation of a state law or regulation does not violate the Constitution unless it also amounts to a violation of the Due Process Clause of the Fourteenth Amendment -- a deprivation of life, liberty or property without due process of law. *See, e.g., Allison v. Snyder*, 332 F.3d 1076, 1078-79 (7th Cir. 2003); *Shegog v. Washington*, 194 F.3d 836, 837-38 (7th Cir. 1999). There was no such deprivation here.

A prisoner may have "liberty interests" that may not be taken without due process of law, but the Due Process Clause does not create a liberty interest in avoiding transfer to another institution, *Meachum v. Fano*, 427 U.S. 215, 224 (1976), or in remaining in the general prison population, *Hewitt v. Helms*, 459 U.S. 460 (1983). The *Hewitt* Court held that mandatory language in state laws or regulations can give prisoners a liberty interest in avoiding segregation unless state officials follow prescribed procedures. In *Sandin v. Conner*, 515 U.S. 472 (1995), however, the Supreme Court sharply limited such liberty interests, holding that state law can create an enforceable liberty interest in avoiding additional restraints only if the restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

Because segregation is commonly employed to punish prisoners, it could be inferred that it represents an "atypical and significant hardship." Nevertheless, the Supreme Court held in *Sandin* that because prisoners held in non-punitive administrative segregation and protective custody are confined under similar conditions, "[the plaintiff's] discipline in segregated confinement

4

did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.* at 486. Although the prisoner in *Sandin* had only spent thirty days in segregation, *Sandin* has been understood as holding that disciplinary segregation generally is not an atypical and significant hardship -- in effect, that segregation, even arbitrarily imposed, *is* one of the "ordinary incidents of prison life." Consequently, whether state officials follow state regulations in committing prisoners to segregation is not of constitutional concern. *See Walker v. O'Brien*, 216 F.3d 626, 630 n.3 (7th Cir. 2000); *Thomas v. Ramos*, 130 F.3d 754, 762 (7th Cir. 1997); *Wagner v. Hanks*, 128 F.3d 1173, 1176 (7th Cir. 1997). Neither Steele's confinement in segregation nor his transfer to Stateville states a constitutional claim.

## II. Assault on August 19, 2001

Steele alleges that on August 19, 2001, at about 6:45 p.m., Steele and other inmates on his gallery were taken to the showers by three correctional officers whom Steele has named as "John Doe" defendants. Steele alleges that John Doe #1 and John Doe #2 were ordered to allow an inmate named Bealer to be handcuffed with his hands in front, while Steele and the other inmates were handcuffed behind their backs.[3] Steele does not state who gave this order. He alleges that John Doe #3 gave him a knowing look after handcuffing him, suggesting that something was afoot.

Steele alleges the officers "failed to recognize" that Bealer was wearing magazines around his body, improvised armor in preparation for a fight. When the group arrived at the shower room, John Doe #3 began removing the inmates' handcuffs through a "chuckhole."[4] Steele went first,

---

[3] Steele gives the inmate's name as "Bealor," but it is spelled "Bealer" in IDOC's documentation of the incident.

[4] The court infers that the inmates entered the shower room with cuffed hands, a solid door was closed separating the inmates in the shower area from the correctional officers outside, and the inmates then presented their cuffed hands at a small port in the door for a correctional officer to remove the cuffs.

5

and again John Doe #3 smiled at Steele.

Bealer then began stabbing Steele with a homemade knife. Steele alleges that the officers did not enter the shower area to stop Bealer, and Steele would have been killed if another inmate had not stepped between them. Steele alleges it took three to five minutes for Bealer to be restrained, but if the officers did not enter the shower it is unclear who restrained Bealer. Steele was taken to the prison health care unit and then sent to an outside hospital emergency room for further treatment.

Steele's grievance relating to this incident is not among the exhibits to the complaint, but he has provided IDOC's final response dated December 17, 2001, written by Defendant Leora Harry on behalf of IDOC's Administrative Review Board, with the concurrence of the Director of IDOC at the time, Defendant Donald N. Snyder, Jr. The response states:

> Concerning your allegations of "indifference of staff," protocol requires a ranking officer be present before the escorting officers could enter the shower room and subdue the inmates. The investigation found that none of the staff delayed coming to your aid.

Cmplt. Attachment S.

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations and internal quotations omitted). Liability, however, depends upon actual knowledge of a risk to the inmate's safety. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.*, 511 U.S. at 847.

A correctional officer who knew in advance that Bealer planned to assault Steele would be

liable for letting it happen. Otherwise, the officers' liability would depend on whether they responded reasonably once they realized that Steele was being stabbed. Correctional officers are not required to risk their own lives to protect inmates, but at this stage we assume that the three officers could have intervened without undue risk to themselves. If, as IDOC's response to Steele's grievance indicates, an administrative directive prohibited their doing so until a superior officer could be summoned, the court will have to address what effect, if any, such a directive may have on their potential liability.

Steele has stated a claim against the "John Doe" correctional officers. As to the other Defendants, Steele alleges he "pleaded with Defendant[s] Knight, Page and Briley to be transferred from Stateville which had been going on since June of 2000 to August of 2001, due to Plaintiff having enemies at Stateville who had wanted to attempt to kill him," and that "Plaintiff gave the names of person[s] who could possible make an attempt upon his life, but Plaintiff's pleas for help went unanswered." Cmplt. ¶¶ 17, 18.

In contrast to his other claims, Steele has alleged no particulars regarding these "pleas for help," nor furnished copies of letters or grievances. The Federal Rules do not require him to do so in order to state a claim. Nevertheless, a plaintiff may not make allegations known to be false, see Rule 11(b), Fed.R.Civ.P., and a claim based on such allegations is to be dismissed as malicious. See *Horsey v. Asher*, 741 F.2d 209, 212 (8th Cir. 1984). Steele's allegation that he pleaded with Knight, Page and Briley to protect him is contradicted by two written statements Steele submitted in response to a disciplinary report issued against him at Stateville and offered by Steele as Complaint Attachment O.

In the first statement dated October 4, 2001, Steele claims he "never had any problem with Mr. Bealer, #K68852. Since I have being [sic] in Stateville C.C. nor have I ever had problem with any other inmate." The second statement is dated August 19, 2001, but a notation "10-4-001" in the upper right corner indicates that it was copied and submitted with the first statement on the

7

latter date. In the second statement, Steele similarly asserts, "I never had any problem with this inmate [Bealer] nor did I have any problem with any inmates."

These statements indicate that Steele never made his alleged pleas for help. Whether or not these statements (that Steele had no problems with other inmates) are true, Steele would hardly have made them if he had previously pleaded with Knight, Page or Briley to protect him from his enemies. The court accordingly dismisses Steele's claim that Defendants Knight, Page and Briley were deliberately indifferent to the risk that Bealer would attack him. In the October 2001 statements, copies of which Steele has attached as exhibits, he has effectively "pleaded himself out of court" with respect to these Defendants.

## III. The Disciplinary Charge of August 29, 2001

When Steele returned to Stateville from the hospital emergency room he was placed in segregation. He was transferred to Pontiac Correctional Center twelve days later, where he was served with a disciplinary report dated August 29, 2001, charging him with gang activity and conspiracy to assault another inmate at Stateville. The disciplinary report alleged that on August 21, 2001, Defendant Correctional Officer T.I. Durrett learned from a confidential informant that Steele had spoken with an inmate named Diaz concerning a planned assault on an inmate named Rivera. The planned assault was allegedly to punish Rivera for informing on three members of the Maniac Latin Disciples, Steele's gang, who had assaulted Rivera in January of 2001.

The Pontiac Adjustment Committee conducted a hearing on this charge on September 5, 2001. Steele received a continuance to prepare his defense, and the disciplinary report was remanded to be rewritten for unspecified reasons. On September 17, 2001, Steele presented a written statement denying the charges, and requesting that both he and the informant be given polygraph examinations and that Diaz be asked whether the alleged conversation took place. The

8

Committee remanded the disciplinary report to Durrett for more information to substantiate the charges. Cmplt. Attachment M.

The rewritten disciplinary report dated September 28, 2001, Cmplt. Attachment N, tied the charges against Steele to Bealer's August 19 assault. The report alleged that Bealer had stated that he had overheard Steele and another inmate talking about assaulting someone, and Bealer concluded that he was the intended victim. Steele's response, Cmplt. Attachment O, denied any conflict with Bealer and stated that unnamed correctional officers told Steele that they knew who had sent Bealer to stab him. Steele again denied planning an assault on Rivera and requested a polygraph examination.

On October 8, 2001, the Pontiac Adjustment Committee found Steele guilty and recommended that he be demoted to "C" grade for one year, serve one year in segregation and forfeit a year of statutory good conduct credit. The punishment was approved by the warden of Pontiac, Defendant James Schomig, on October 17, 2001. Cmplt. Attachment P.

Steele appealed the disciplinary conviction with a lengthy and incoherent grievance, Cmplt. Attachment R, in which he attempted to link together the three incidents addressed in this suit: the disciplinary report from Hill Correctional Center based on an informant's accusation that he was planning an assault, the assault on Steele at Stateville by Bealer, and the charge that Steele had conspired at Stateville to have Rivera assaulted. Steele alleges that the grievance was denied, but does not provide a copy of the decision.

Although Steele's grievance raised various procedural objections, Steele does not appear to be claiming that he was denied his constitutional right to due process of law in the disciplinary proceeding. Rather, Steele complains that the disciplinary report

> was ficticious [sic] and only created to cover up the fact that Plaintiff had repeatedly informed Defendants Knight, Page and Briley that he was in danger and that they did nothing to stop it. Also, the fact that Defendant Doe #3 had knowledge that Plaintiff was going to be attacked during the shower time was to be covered up by Defendant Durrett writing the fictitious [sic] disciplinary report.

9

Cmplt. ¶ 29. Steele's "Third Cause of Action" claims that Defendants "conspired to cover up Plaintiff being attached [sic] by inmate Bealor by writing Plaintiff a fictitious [sic] ticket, finding him guilty of that ticket and taking one year of statutory good conduct credits away from Plaintiff." Cmplt. ¶ 34(a).

This claim makes little sense. Assuming that the accusation in the disciplinary report from Stateville was false, and even assuming that everyone involved in the disciplinary proceeding at Pontiac knew it to be false, how could this be a "cover-up"? What could it conceal, and from whom? Only the last version of the disciplinary report made any reference to the assault on Steele, and it contained nothing at all relating to correctional officials' prior knowledge of any danger to Steele generally, or the assault perpetrated by Bealer in particular. Convicting Steele of conspiracy to assault another inmate would permit IDOC officials to characterize him as a dangerous gang leader -- as they apparently already did -- but that characterization could not affect their duty to protect him from known dangers or their liability if they had failed to do so.

A conspiracy to punish Steele on false charges could give rise to a claim of denial of due process, but such a claim would be premature. Illinois law confers upon prisoners a right not to be deprived of good conduct credit except in accordance with state law and regulations, a liberty interest protected by the Due Process Clause. *Hamilton v. O'Leary*, 976 F.2d 341, 344 (7th Cir. 1992). Because loss of good conduct credit affects the length of a prisoner's incarceration, this liberty interest survives *Sandin*.

Nevertheless, although loss of good time credit implicates the constitutional right to due process of law, Steele cannot seek damages under § 1983 for the deprivation of that right. Because the length of a prisoner's incarceration may be challenged in federal court only by way of a habeas corpus proceeding, a prisoner alleging official misconduct that would, if proven, invalidate a disciplinary conviction may not sue for damages resulting from the conviction until it has been overturned through state administrative and judicial procedures, or, if these are

10

unavailing, through a federal writ of habeas corpus. *Edwards v. Balisok*, 520 U.S. 641 (1997). Because nothing in the complaint indicates that this has occurred, Steele has no claim arising from this incident.

## CONCLUSION

Steele is left with the single claim that the three "John Doe" officers failed to protect him. So that Steele can learn their identities and name them as Defendants, Warden Briley will remain a nominal Defendant, but will not be required to answer the complaint.

The clerk shall issue summons to Defendant Briley, and the U.S. Marshal is directed to serve him with the summons, a copy of the complaint, and a copy of this order. Briley is not required to answer the complaint. Within thirty days of service, Briley, or his attorney or agent, shall provide Steele with the names and identification photographs of the correctional officers who escorted Steele to the showers on August 19, 2001, and certify to the court when this has been done. Steele shall then have thirty days to file an amended complaint against the Defendants identified as "John Does #1-3," limited to his claim that they failed to protect him from Bealer's assault.

ENTER:

Dated: August 12, 2003

REBECCA R. PALLMEYER
United States District Judge

11